HENRY WATERHOUSE TRUST COMPANY, LIMIT-ED, RECEIVER OF SECURITY TRUST COM-PANY, LIMITED, *v.* HOME INSURANCE COM-PANY OF HAWAII, LIMITED.

### No. 1490.

ERROR TO CIRCUIT COURT FOURTH CIRCUIT.
HON. H. L. ROSS, JUDGE.

ARGUED SEPTEMBER 13, 1923.        DECIDED OCTOBER 22, 1923.

PERRY AND LINDSAY, JJ., AND CIRCUIT JUDGE BANKS
IN PLACE OF PETERS, C. J., DISQUALIFIED.

CORPORATIONS—*knowledge of officers as affecting corporation.*

As a general rule the knowledge of the officers and agents of a corporation is deemed to be the knowledge of the corporation; but when the officer whose knowledge is sought to be charged to the corporation aids or abets or participates in a fraud upon the corporation for the benefit of himself or another, his knowledge is not imputable to the corporation.

SAME—*separate existence—fraud—burden of proof.*

The ordinary presumption is that when a corporation has been formed in the manner provided by law it continues to have existence as a separate and distinct entity. When it is claimed that a corporation is in reality not a separate entity but is merely an adjunct or department or instrumentality of another corporation for purposes of fraud, the burden rests upon those so contending to prove the fact.

SAME—*separate existence—instructions—evidence.*

> Upon the undisputed evidence in this case, *held* that it was correct to instruct the jury that two certain corporations were separate and distinct entities.

## OPINION OF THE COURT BY PERRY, J.

This is an action at law to recover the sum of $10,000 on a bond given by the defendant, a fidelity insurance company, whereby it bound itself to pay to the Security Trust Company, Limited, of whose property the plaintiff is the receiver, "as employer, such pecuniary loss as the employer shall have sustained of money or other personal property (including that for which the employer is responsible) by any act or acts of fraud, dishonesty, forgery, theft, larceny, embezzlement or wrongful abstraction or misapplication on the part of any employee named in the schedule forming part" of the bond "directly or through connivance with others, while such employee is serving the employer in any position during the term and at any location" of the suretyship. The essential allegations of the declaration are that during the term of the suretyship, one H. A. Truslow was the vice-president and manager and an employee of the said Security Trust Company, Limited, within the meaning of the bond, and that during the term of the suretyship Truslow fraudulently, dishonestly and wrongfully abstracted from the funds of the Security Trust Company the sum of $10,664.82 and misapplied the same to the use of the Securities Trading Corporation, Limited, a Hawaiian corporation. Evidence for both sides having been adduced the presiding judge instructed the jury to render a verdict for the plaintiff for the full amount claimed; and this the jury did. The case comes to this court by writ of error upon assignments designed to test the correctness of the court's instruction.

The more important defenses relied upon in this court are that the Security Trust Company, Limited, herein-

after called the trust company, and the Securities Trading Corporation, Limited, hereinafter called the trading company, were in reality not separate entities and that the trading company was merely an adjunct or the *alter ego* of the trust company and that the court will not allow the doctrine of separate corporate entities to aid in perpetuating a fraud upon the defendant; that, the trading company not being a separate entity from the trust company, the case stands as though the $10,664.82 was taken out of one pocket of the trust company and placed in another of its pockets; and that the trust company did not notify the defendant of the misapplication of funds and of the loss within ten days from the discovery thereof.

The evidence in the case in so far as it is material to the issues involved was undisputed and was not susceptible of conflicting inferences of fact. Under these circumstances it becomes purely a question of law whether the plaintiff can or cannot recover.

The trust company was the first of the two corporations to be incorporated. It was formed, as its name implies, for the purpose of conducting a trust business within the meaning and limitations of the laws of Hawaii on the subject. For some time it engaged in the business of buying and selling for itself and for clients mainland stocks on margins and this, it seems, had proved a profitable business. Some time prior to November 1919, Truslow, who was then the treasurer and manager of the trust company, thought it advisable to form a new corporation to take over this business and so informed the directors of the trust company. The matter was discussed informally by the president and other directors of the trust company and it was their view that a new corporation should be formed for the purpose just stated. No corporate action, however, to this effect was taken either by the stockholders or by the directors of the trust company. There is no

minute of any such action.  A circular letter signed by Truslow as treasurer of the trust company was forwarded to the stockholders of the trust company, reading in part as follows: "To properly handle our rapidly increasing stock and bond business, it has been deemed advisable by the directors of your company to organize a separate company to take care of this particular line.  The stock of this subsidiary company will be owned entirely by the Security Trust Company, Limited, and its stockholders. We desire that each stockholder shall take up his pro rata of this new stock and you are hereby requested to subscribe for one share of stock in the 'Securities Trading Corporation, Limited,' for every two shares of stock you hold in the Security Trust Company, Limited."  The trading company was subsequently incorporated by filing articles of association and the affidavit required by law. In all, about eighteen persons subscribed to the stock of the new corporation.  The trust company subscribed to 1250 shares of this stock, the aggregate of the other subscriptions being 275 shares.  Upon the incorporation of the trading company, certain assets and certain liabilities of the trust company were transferred, upon the books of account, to the trading company.  The trust company had been doing its mainland stock and bond business through Hutton & Company of San Francisco.  After the transfer of this business by the trust company to the trading company, the trust company acted as the agent of the trading company and continued to deal through Hutton & Company of San Francisco.  On Hutton & Company's books, the account of the trust company continued and no account was opened with the trading company, the latter evidently not being known to Hutton & Company.

One McCallum, prior to April 11, 1921, purchased 250 shares of Middle States Oil Company stock and, prior to April 19, 1921, 200 shares of Atlantic Gulf and West

Indies Steamship Company stock (hereinafter referred to as A. G. W. I.). On April 11, 1921, Truslow ordered Collins, who was the treasurer of the trust company and bookkeeper of the trading company, to wireless to Hutton & Company to sell 1625 shares of Middle States Oil stock (all that the trading company then had for itself and its clients, including McCallum's 250 shares) and on April 19 to send a similar order with reference to 350 shares of A. G. W. I. (all that it then had for itself and its clients, including McCallum's 200 shares). Shortly thereafter Hutton & Company reported by wireless that they had sold this stock, giving the amounts of the proceeds. If McCallum's share of the proceeds of these two stocks had been credited to his account—as it should have been— there would have remained to his credit on the books of the trading company approximately the sum of $200; but no such credit was given him. Instead, Truslow ordered Collins to enter the proceeds, which in truth belonged to McCallum, in a so-called special suspense account in the books of the trading company,—for the purpose, it is surmised by counsel in this case, of later repurchasing for itself the stock when its market value should decline. All of this was in April, 1921. Subsequently, Truslow requested McCallum to give the trading company an assignment of a lease, held by McCallum, as further security for the repayment to the trading company of the advances theretofore made to McCallum by the trading company and on July 7, 1921, McCallum executed and delivered such an assignment. On August 30, 1921, Truslow, as treasurer, and J. W. Russell, as president of the trading company, executed an assignment by the trading company to the trust company of McCallum's account with the trading company for the sum of $10,664.82, the trading company covenanting in the instrument of assignment that McCallum was indebted to it in the sum of $10,664.82

and guaranteeing the payment of the same by the said William McCallum. A check for the sum of $10,664.82 was on September 1, 1921, signed on behalf of the trust company by Collins at the direction of Truslow and was deposited to the credit of the trading company with the People's Bank, Limited, of Hilo and later that amount was paid by the trading company to the bank on account of certain indebtedness then owing by the trading company to the bank. McCallum, of course, at the time of the purported .assignment of his account with the trading company was not indebted to the trading company at all but had a credit of approximately $200 due him by the trading company. The transaction was an unmitigated fraud perpetrated by Truslow who was at the time not only the treasurer of the trading company but also the vice-president of the trust company.

On November 30, 1921, an expert employed to make an examination into the affairs of the trust company made a report to George H. Vicars, who was then acting as the manager of the trust company, of the McCallum account and transaction. That was the first that Vicars knew of the fraud. He immediately referred the report to the trust company's attorney who, in turn, within ten days of the report by the expert gave notice to the defendant of the misapplication of funds and the loss. It is contended, however, by the defendant that it is a complete defense to this action that notice was not given to the defendant within ten days of August 30, 1921, the date of the assignment of the McCallum account. The argument for the defendant is that a corporation can act only through its officers and agents and that it is chargeable with the knowledge had by its officers and agents; that Collins, who was at the time treasurer and manager of the trust company, had actual knowledge of the state of the McCallum account, of the sale of the McCallum stocks, of the

failure to credit McCallum's account with the proceeds of those sales, of the crediting of those proceeds to the trading company's special suspense account, of the making of the assignment and of the application by the trading company to its own use of the $10,664.82 received by it from the trust company as purported consideration for the assignment; and that the actual knowledge of Collins on these subjects must be deemed to be the actual knowledge of the corporation. It is true that a corporation can act only through officers and agents and that as a general rule the knowledge of its officers and agents is deemed to be the knowledge of the corporation. This latter is in large measure due to the fact that it is reasonable to suppose that officers and agents acting for the corporation will communicate to the board of directors or to the stockholders the transactions of which they have knowledge. The exception is, however, equally well settled that when the officer whose knowledge is sought to be charged to the corporation aids or abets or participates in a fraud for the benefit of himself or of another, his knowledge is not imputable to the corporation. It would be unreasonable to suppose that under such circumstances such participating officer would do otherwise than keep the fraud secret. There would be no room for the inference that he would as a dutiful officer immediately transmit his knowledge to the stockholders or directors of the corporation that he was serving. It would be, on the contrary, more consistent with human nature and its ordinary workings to infer that such an officer would not make any report of the fraudulent transaction. In such cases as those last mentioned, a fidelity company is not relieved from liability either because of the participation of some officer other than that whose fidelity is guaranteed or because such other officer or the corporation did not within the time

limited in the bond give notice to the fidelity company of the loss.

"It is well settled that, in the absence of express agreement, the surety on a bond given to a corporation, conditioned for the faithful performance by an employe of his duties, is not relieved from liability for a loss within the condition of the bond by reason of the laches or neglect of the board of directors, not amounting to fraud or bad faith, and that the acts of ordinary agents or employes of the indemnified corporation, conniving at or cooperating with the wrongful act of the bonded employe, will not be imputed to the corporation.. * * * The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his infidelity, ought not in reason, and does not in law or equity, relieve them from their responsibility for him. They undertake that he shall be honest, though all around him are rogues. * * * The principle of law * * * that the knowledge of an agent is in law the knowledge of his principal, is intended for the protection of the other party (actually or constructively) to a transaction for and on account of the principal had with such agent. In the very nature of things, such a principle does not obtain in favor of a surety who has bonded one officer of a corporation, so as to relieve him from the obligations of his bond, by imputing to the corporation knowledge acquired by another employe subsequent to the execution of the bond, (and from negligence or wrongful motives, not disclosed to the corporation,) of a wrong committed by the official whose faithful performance of duty was guaranteed by the bond. As the rule of imputation to the principal of the knowledge of an agent does not apply to such case, it must follow that it can only obtain as a consequence of an express provision of the contract of suretyship." *Fidelity Co.* v. *Courtney,* 186 U. S. 342, 360, 361, 362.

"The presumption that the agent informed his principal of that which his duty and the interests of his principal required him to communicate does not arise where the agent acts or makes declarations not in execution of

any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them." *Am. Surety Co.* v. *Pauly,* 170 U. S. 133, 156.

"One of the exceptions was that where the agent was 'engaged in a scheme to defraud his principal, the presumption does not prevail, because he cannot in reason be presumed to have disclosed that which it was his duty to keep secret, or that which would expose and defeat his fraudulent purpose.' " *Ib.* 157.

"The presumption arising from the duty of the agent to communicate what he knows to his principal 'may be repelled by showing that, whilst he was acting as agent, he was also acting in another character, viz., as a party to a scheme or design of fraud, and that the knowledge which he attained was attained by him in the latter character, and that therefore there is no ground on which you can presume that the duty of an agent was performed by the person who filled that double character.' " *Ib.* 157.

"Ordinarily a corporation is chargeable with any facts which are known to its agents, but in transactions of a dishonest character between co-employees, where one participates in the perpetration of a fraud upon the corporation for the benefit of the other, the law does not infer that the agent will communicate the facts to the corporation, and under such circumstances the corporation is not bound." *Wells, Fargo & Co.* v. *Walker,* 9 N. M. 456.

To the same effect is *Kendrick Co.* v. *Weaver,* 163 S. W. (Tenn.) 814, 819.

The undisputed evidence shows that Collins (whether through ignorance or feloniously we need not say) carried out Truslow's orders at every stage of the McCallum transaction and aided and participated in the fraud which Truslow committed. Whether his failure to report the fraud to the corporation was due to negligence or to his desire to keep the fraud secret is immaterial. The case

falls clearly within the exception to the rule as that exception is stated in the foregoing authorities. It falls within the reason underlying the exception. Under the circumstances the knowledge of Collins as a matter of law cannot be imputed to the trust company and the particular defense under consideration cannot be supported.

The fact or fiction, whichever it may be called, that a corporation is an entity separate and distinct from its stockholders and from other corporations is sometimes disregarded by courts in aid of justice and equity and in order to prevent the accomplishment of a fraud or other wrong. The general rule and ordinary presumption, however, is that when a corporation has been formed in the manner provided by law, it continues to have existence as a separate and distinct entity. If it be claimed in any given case that a corporation is in reality not a separate being but is merely an adjunct or department or instrumentality of another corporation, the burden rests upon those so contending to prove that fact. The mere fact that the stockholders in the two corporations are the same or that one corporation owns shares in another or even the majority of shares or that the two corporations have many dealings with each other will not ordinarily suffice to show that the one is a mere instrumentality of the other.

"It is an elementary and fundamental principle of corporation law that a corporation is an entity separate and distinct from its stockholders and from other corporations with which it may be connected. The fact that the stockholders of two separately chartered corporations are identical, that one owns shares in another, and that they have mutual dealings, will not, as a general rule, merge them into one corporation." *In re Watertown Paper Co.*, 169 Fed. 252, 255.

"Neither does the fact that the one corporation exercised a controlling influence over the other through the ownership of its stock or through the identity of stockholders, operate to make either the agent of the other, or

to merge the two corporations into one." *Richmond Construction Co.* v. *R. R.,* 68 Fed. 105, 108.

"It makes no difference in principle whether the sole owner of the stock of a corporation is a man or another corporation. The corporation owning such stock is as distinct from the corporation whose stock is so owned as the man is from the corporation of which he is the sole member." *Exchange Bank* v. *Macon Co.,* 25 S. E. (Ga.) 326, 328.

"So also the provision that the stock of such new company should first be offered to stockholders of the appellant to subscribe for, or not, at their option, would not make the new corporation identical with the appellant, even if all the stock had been so subscribed for as to have included all the stockholders of the appellant. The corporation would not only differ in organization, but in objects and functions." *United Mines Co.* v. *Hatcher,* 79 Fed. 517, 519.

"If any general rule can be laid down in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." *Smith* v. *Moore,* 199 Fed. 689, 700.

"While the courts of law strictly observe the fiction of corporate entity, there has been for years a growing indisposition to permit corporate entity to be employed either as an instrumentality or as a cloak for fraud or for successful evasion of the law." *Quaid* v. *Ratkowsky,* 170 N. Y. S. 812, 815.

To the same effect are 14 C. J. 61; 1 Fletcher Cyc. Corp. Sec. 45; *R. R.* v. *Minn. Civic Assn.,* 247 U. S. 490, 500, 501; and *Bank* v. *Trebein,* 59 Ohio St. 316, 326, 327.

In the case at bar, on this as on the other branch of the case, the facts are undisputed and it, therefore, becomes a question of law as to whether the trading company was an entity separate and distinct from the trust

company. There is much in the evidence that, on a superficial view of the case, might seem to support the theory that the trading company was merely an adjunct or instrumentality of the trust company; but upon a more careful study it will be found that this was not so and that a finding to the effect that the trading company was a mere instrumentality or conduit of the other would be unsupported by any evidence.

The trading company, like the trust company, was duly created in the manner authorized by law, by the filing of articles of association agreed to by the requisite number of persons and of an affidavit. It was thereby given life as a corporation and as an entity distinct from all other corporations and from all persons. It is true that there is evidence of the following: that the trading company had no by-laws; that neither the stockholders nor the trust company ever had any meeting; that upon the incorporation being completed, certain of the assets and certain of the debts of the trust company were transferred, on the books of account of the two companies, to the trading company, without any appraisement of the true value of the assets; that the trading company occupied the same offices as the trust company; that the trading company paid no rent; that Hutton & Company of San Francisco, through whom all the transactions in mainland stocks were carried out, did not know the trading company and maintained their account solely with the trust company; that the books of the company were kept in the vault of the trust company; that some of the bills of the trading company were sent out in the name of the trust company (although in these instances the items were entered in the books of the trading company); that the trading company had the same employees as the trust company; that the trading company paid no salaries to its officers or employees; that all but two of the directors

of the trading company were directors of the trust company; that all commissions earned upon the dealings with mainland stocks were credited to the trust company on the books of the trading company and were actually paid to the trust company; and that the trading company did not at any time receive any commissions from the transactions recorded on its books.

On the other hand, there was no evidence of any corporate action by the trust company directing that the affairs of the trading company should be conducted in the particular manner disclosed by the foregoing items or of any corporate action showing an intention or a desire on the part of the trust company as a corporation to place the trading company in the position of a mere department, instrumentality or conduit of the trust company. In the articles of association it was provided that five certain persons therein named should be respectively the president, the vice-president, the secretary, the treasurer and the auditor of the corporation for the first year. While there was no sign within the trust company's offices or on its tables indicating where the business of the trading company was being done, there was published daily outside of the door of the trust company's offices a sheet relating to the market prices of the stocks and bonds dealt in by the trading company, under the name of the trading company. The latter in its own name advertised in one, at least, of the Hilo papers the fact of its creation for the purpose of facilitating dealings in mainland stocks and bonds and extolling its own virtues as a medium for such dealings. The trading company purchased, as an investment of its own, stock in a newly established bank on the Island of Kauai. It loaned, on its own account, money to a drug company in Hilo. It bought and sold local stocks on its own account and retained for itself the commissions arising out of these transactions. It paid two dividends,

although small in amount, to its own stockholders. It borrowed heavily in its own name and upon its own credit without any endorsement or other aid from the trust company. It was sued by the People's Bank of Hilo for moneys loaned upon notes given in its own name and by its own officers and judgment was recovered against it in the sum of $149,902.84. It had its own eighteen or nineteen stockholders while the trust company had about one hundred and forty stockholders. It received interest on moneys loaned by itself and retained it for its own purposes and did not credit it to the trust company. It received dividends from stocks owned by itself and credited them to itself and did not pay them to the trust company. It has large outstanding liabilities which so far as the record shows never were in any way assumed by the trust company. Its purposes and powers are different from those of the trust company. It may lawfully carry on business which the trust company could not lawfully conduct. Both Truslow and Russell borrowed large sums of money from the trading company. The transactions of moneys borrowed from and moneys loaned to the trading company were not at any time reported by the officers of the trading company to the trust company or by Truslow or other officers of the trust company to the trust company. Separate tax returns were made by the two corporations. The notes of the trading company were never listed as liabilities of the trust company.

While in some respects the affairs of the two corporations were conducted as though they were one, the evidence shows that it was Truslow who did this and there is no evidence that any of it was done by the trust company as such either through its stockholders or through its directors. The evidence shows, moreover, that the fraud disclosed by the McCallum, and perhaps other transactions, was the fraud of Truslow and not the fraud of

either the stockholders or the directors of the trust company. There is no evidence of any fraud being attempted upon the present defendant. While Truslow apparently used the two companies and their affairs for the advancement of his own ends there is no evidence which would justify fixing the liability for these frauds upon the trust company or rendering it or its stockholders liable either for the misdoings of Truslow or for the liabilities of the trading company. Upon the evidence as it stood at the close of the trial, the presiding judge followed the only correct course in withdrawing the case from the jury and in instructing it to render a verdict for the plaintiff for the full amount claimed. No other verdict would accomplish justice in the premises or satisfy the requirements of the law.

The remaining contention of the defendant, that because the trust company owned a large portion of the stock of the trading company therefore it should share proportionately in the loss of the $10,000 with the fidelity company, does not impress us favorably. If the trust company was an entity separate from the trading company and from its own stockholders, as it must be held to have been, the fact that it owned a portion of the stock of the trading company cannot be of any materiality upon the question of its right to recover upon the bond for the loss which it as a corporation has sustained. A breach of the bond having occurred, it becomes the duty of the fidelity company to perform its undertaking to pay the amount of the loss up to $10,000. So also of the contention that the loss should be prorated between the trust company and the fidelity company in the proportion that the amount and value of certain property shown to have been recovered by the trust company from Truslow bears to the total loss. The answer to this is that upon the undisputed evidence the property delivered to the trust

company was by the action of both parties applied to another debt of Truslow's to the trust company.

The judgment appealed from is affirmed.

*A. L. Castle* and *U. E. Wild* (*Robertson & Castle* and *Smith & Wild* on the briefs) for plaintiff in error.

*W. H. Smith* (*H. Irwin* with him on the brief) for defendant in error.

