34 F.3d 1072
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Thomas E. HAYES, Agretech Trustee, Steven Guttman, FPI
Trustee, Plaintiffs-Appellants,
v.
ARTHUR YOUNG & COMPANY, Defendant-Appellee.
Thomas E. HAYES, Agretech Trustee, Steven Guttman, FPI
Trustee, FPI Nursery Partners 1985-I Public
Offering Class, Plaintiffs-Appellees,
v.
Karl HAUSHALTER, Ernest & Young, formerly Arthur Young &
Company, Defendants-Appellants.
In re FPI/AGRETECH SECURITIES LITIGATION.
Thomas E. HAYES, Agretech Trustee, FPI Nursery Partners
1985-I Public Offering Class, Plaintiffs-Appellants,
v.
Karl HAUSHALTER, Ernest & Young, formerly Arthur Young &
Company, Defendants-Appellees.
 
 Nos. 91-15531, 91-15546 and 91-15593.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 7, 1992.
Decided Aug. 26, 1994.
 Before: HALL, BRUNETTI, and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Chapter 11 bankruptcy proceedings were initiated against a tropical plant grower and a tax shelter promoter who contracted plant production out to the grower. Their bankruptcies provoked a number of lawsuits, two groups of which are before us on appeal.
 
 
 3
 The first group comprises three consolidated class actions filed by investors in eight of the limited partnership tax shelters against the promoter's accounting firm, for violations of state common law and federal securities law. The jury returned verdicts for the plaintiffs on all claims, and the accounting firm appeals. We affirm the Section 11 and state-law negligent misrepresentation verdicts, as well as the resulting awards of actual damages. We reverse the other verdicts and remand for retrial on the issue of punitive damages. We also reverse and remand several of the district court's post-trial rulings.
 
 
 4
 The second group comprises two lawsuits filed by the bankruptcy trustees of the two companies against the accounting firm for common law fraud and negligence. The district court granted the defendant's motion to dismiss, and the bankruptcy trustees appeal. We reverse the dismissals and remand for further proceedings.
 
 FACTS AND PRIOR PROCEEDINGS
 
 5
 FP Investments, Inc. ("FPI") was incorporated in 1980 to form and syndicate limited partnerships to be used as tax shelters by investors. Each partnership was sold to the public through a national network of independent brokers, by means of a written offering memorandum (prospectus) describing the business structure, purposes, and expectations for the partnership. Copies of the offering documents were delivered to the selling brokers, and in turn to the investors prior to investment.
 
 
 6
 Beginning in 1982, FPI focused its activities in the tropical foliage area. By early 1985, FPI had syndicated over forty partnerships to acquire tropical plants and cultivate them to maturity in Hawaii, with the object of then selling them to customers on the United States mainland, primarily in California. Most of these partnerships were private; one, FP Nursery Partners 1984-I L.P. ("1984-I"), was registered with the Securities and Exchange Commission ("SEC") and sold to the public.
 
 
 7
 FPI contracted the production of these plants out to Agricultural Research & Technology Group, Inc. ("Agretech"). Agretech provided all the labor, material, and facilities necessary to grow the plants to the specified saleable sizes. Agretech also marketed the plants at prices stated in the offering documents and remitted the sales proceeds to the partnerships.
 
 
 8
 Although Agretech was paid in advance for all plant material and services, it soon ran into trouble and found that it did not have the money or space to meet its obligations. To conceal these problems and to enable FPI to continue syndicating partnerships, the principals of FPI and Agretech hatched and implemented a "Ponzi scheme." Funds from new FPI plant partnerships were recirculated to investors in prior ones; the funds were disguised to make them look like the proceeds from sales of earlier partnerships' plants. However, the scheme failed; chapter 11 bankruptcy proceedings were initiated against Agretech in September 1986 and against FPI in March 1987, and several of the two companies' top executives went to jail.
 
 
 9
 From 1982 through early 1985, Coopers & Lybrand served as independent auditors for FPI. In February 1985, FPI discharged Coopers & Lybrand and hired appellants Arthur Young & Company[1] and Karl Haushalter, an Arthur Young audit partner (collectively "AY"). Unqualified AY audit reports were contained in the offering materials for eight partnerships: FP Nursery Partners 1985-I L.P. ("1985-I"), a public partnership offered between November 1985 and March 1986; five unregistered orchid partnerships, offered between February 1986 and July 1986; and the private partnerships Hawaiian Capital Partners and Hawaiian Nursery Partners ("HCP/HNP"), offered between September 1986 and December 1986. All of the funds invested in these partnerships were lost as a result of FPI's bankruptcy.
 
 
 10
 The collapse of FPI and Agretech provoked a large number of lawsuits against AY and others. These lawsuits were consolidated before Judge Real in the District of Hawaii. In one group of lawsuits, Thomas Hayes, the bankruptcy trustee of Agretech, and Steven Guttman, the bankruptcy trustee of FPI, sued AY and others for damages caused by, inter alia, negligence and fraud. AY moved to dismiss both complaints pursuant to Fed.R.Civ.P. 12(b)(6), and the district court granted the motions without leave to amend. The bankruptcy trustees appeal the dismissals.
 
 
 11
 Another group of lawsuits consisted of class actions filed by partnership investors against AY and others. Judge Real certified class representatives for the 1985-I investors, who asserted claims under Sec. 11 of the Securities Act of 1933, 15 U.S.C. Sec. 77k (1988); Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1988); and California common law fraud, negligence, and negligent misrepresentation doctrines. Judge Real also certified a class representative for the investors in the seven 1986 private partnerships, who asserted Sec. 10(b) and common law fraud, negligence, and negligent misrepresentation claims. These investors will be referred to collectively as "plaintiffs."
 
 
 12
 After a three-week trial, the jury returned verdicts against AY on all claims. Following a reduction of damages to prevent multiple recoveries for the same claims or injuries, and application of a settlement agreement to the private partnership plaintiffs' damages, the 1985-I plaintiffs were awarded $5.2 million in compensatory damages, $3.0 million in prejudgment interest, and $1.75 million in attorneys' fees, plus all costs. The private partnership plaintiffs were awarded $2.3 million in compensatory damages, $1.1 million in prejudgment interest, and all costs. AY appeals the verdicts and judgments on numerous grounds.
 
 AY APPEAL
 I. Pre-Trial Partial Summary Adjudication
 
 13
 Two crucial factors in the partnerships' viability were the sufficiency of available bench space to grow the quantities of plants envisioned and the adequacy of Agretech's financial resources to cultivate the plants. Prior to trial, plaintiffs moved for partial summary judgment, asking the district court to order that certain material facts be deemed established at the trial. The district court granted part of their motion, and instructed the jury that
 
 
 14
 [t]he following material facts are without substantial controversy, and are deemed to be established:
 
 
 15
 [...]
 
 
 16
 B, the bench space requirements of NP 1985-I and for the other FPI partnerships were not disclosed in the prospectus or in the registration statement for NP 1985-I or in the 1986 offerings.
 
 
 17
 C, the amount of bench space which Agretech actually had was not disclosed in the prospectus or in the registration statement of NP 1985-I or in the 1986 offerings.
 
 
 18
 D, the amount of bench space which Agretech had, the amount of bench space which would have been required for 1985-I, if fully funded, and the amount of bench space that would have been required for the other FPI partnerships were material facts which were required to be disclosed in the prospectus and in the registration statement for 1985-I and in the 1986 offerings.
 
 
 19
 E, as of October 1985, Agretech had an aggregate negative balance of $61,143.55 in all of its bank accounts.
 
 
 20
 F, the amounts that were allocated and to be paid by NP 1985-I to Agretech for cultivation and facilities lease rental, assuming full funding, were as follows: For the cultivation of plants, from the offering proceedings, $821,600; from plant sales, $1,041,700; on behalf of the lease rental, $376,900, for a total of $2,240,200.
 
 
 21
 G, the amount that would actually have been required to cultivate the plants to be acquired by NP 1985-I, the amount that would have been required to cultivate the plants for the FPI partnerships formed prior to NP 1985-I, and Agretech's financial circumstances as of November 1985, were not disclosed in the prospectus or in the registration statement for NP 1985-I or in the 1986 offerings.
 
 
 22
 H, the amounts that would actually have been required to cultivate the plants to be acquired by NP 1985-I, the amounts that would be required to cultivate the plants for the NP partnerships formed prior to NP 1985-I, and Agretech's financial circumstances as of November 1985, were material facts which were required to be disclosed in the prospectus and in the registration statement for NP 1985-I and in the 1986 offerings.
 
 
 23
 (Emphasis added).
 
 
 24
 AY contends that the district court erred in granting plaintiffs' motion, on the ground that whether the facts were "material" was an issue for the jury to decide. We review the district court's grant of summary judgment de novo. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors' Ass'n, 809 F.2d 626, 629 (9th Cir.1987). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 
 25
 A fact is material if "a reasonable investor might have considered [it] important in the making of [his] decision." Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972). "Materiality [is a] fact-specific issue[ ] which should ordinarily be left to the trier of fact." In re Apple Computer Secs. Litig., 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 496 U.S. 943 (1990). "However, summary judgment may be granted in appropriate cases." Id. Summary adjudication is proper "if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.' " TSC Indus. v. Northway, Inc., 426 U.S. 438, 450 (1976) (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir.1970)).
 
 
 26
 Parts B, C, F, and G of the district court's instructions are undisputed; the information was omitted from, or included in, the prospectus included in the 1985-I and 1986 offerings. Part E was not contested by AY. Thus, AY can only challenge Parts D and H. These instructions did not, as AY alleges, state that the offering documents were "rendered 'materially false and misleading' by their omission." Rather, they stated only that the facts were material and required to be included in those documents; whether their omission thereby rendered the documents "false and misleading" was left for the jury to determine.
 
 
 27
 Furthermore, the fact that the district court found that the specific amount of space and funds required was an issue for the jury does not mean that the materiality of those amounts, whatever they were, was also necessarily an issue for the jury. A numerical quantity may be material--important to an investment decision--without the specific quantity being known. The district court did not instruct the jury that the difference between the money and space required versus that available was material--an instruction that would have required a specific quantity determination--but only that the amounts themselves were material.
 
 
 28
 Finally, the district court did not by these instructions "essentially direct[ ] a verdict on all claims against AY;" to find AY liable, the jury still needed to decide whether AY, as the accountant, had a duty to disclose the facts and, if so, whether AY had the proper degree of scienter for not disclosing them. Thus, our review is limited to determining whether the district court erred in finding facts D and H to be material facts requiring disclosure.
 
 
 29
 The amount of funds required to cultivate the partnerships' plants (and therefore whether the partnerships would have sufficient funds to cover those expenses) was clearly a material fact, because it related to the fundamental issue of the partnerships' viability and profitability. Agretech's financial condition was also material, given the prospectus' statement that "the Partnership will be dependent upon the performance of Agretech for the success of the Partnership." Similarly, because of the partnerships' dependence on Agretech, the space required to grow the plants versus Agretech's existing capacity would have been a material issue; again, it related directly to the fundamental matter of the partnerships' viability. These facts are "so obviously important to the investor" that we hold that they are material as a matter of law. Accordingly, the district court did not err in granting the plaintiffs' motion for partial summary judgment.
 
 II. Judicial Misconduct
 
 30
 AY further alleges that the trial judge committed misconduct so serious that it constituted reversible error. We will reverse a verdict for general judicial misconduct only if it "rendered the trial unfair." Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 709 (9th Cir.1990) (as amended). The record must " 'disclose actual bias on the part of the trial judge [or] leave the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.' " Id. (quoting Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 531 (9th Cir.1986)). The examples cited by AY fail to meet this strict standard.
 
 A. Unfair treatment of counsel
 
 31
 First, AY alleges that its counsel were treated more harshly than plaintiffs'. However, the record does not support AY's position. The fact that a greater number of plaintiffs' objections were sustained than defense objections might equally well prove that defense counsel simply violated more evidentiary rules than did plaintiffs' counsel, as AY does not go on to allege that any of the rulings were erroneous. The three examples cited by AY to support its contention that the judge unfairly "chastised" defense counsel were relatively mild and probably justifiable reproofs during AY's hour and a half opening statement.
 
 
 32
 Neither of the instances cited by AY to support its claim that the judge "repeatedly" chastised defense counsel for reading or having the witnesses read portions of exhibits were particularly objectionable. AY also asserts that the judge let plaintiffs lead witnesses freely while chastising AY for doing the same thing. However, AY cites only two instances where it was warned not to lead witnesses; furthermore, plaintiffs' counsel were also admonished not to lead witnesses. AY also cites three examples of plaintiffs' counsel leading witnesses without admonishment, but AY did the same thing itself on at least three occasions. The judge showed no bias in this regard.
 
 
 33
 AY's other claims of inequitable treatment must also fail. Although AY was reprimanded for "pleasantries," plaintiffs were also reprimanded. Although plaintiffs were permitted to question a witness who allegedly lacked personal knowledge after AY was denied permission to question another who had personal knowledge, AY never objected to the plaintiffs' questioning. Finally, the specific questions asked of the witness who AY contends lacked personal knowledge concerned matters which actually did come within his personal knowledge.
 
 
 34
 Overall, we find little merit in AY's claims of unfair treatment, particularly given that the trial judge instructed the jury at the beginning of the trial not to draw any inferences from his admonishing one or the other side for procedural or evidentiary mistakes. Even absent this instruction, moreover, the judge's comments would not have required reversal. See Shad, 799 F.2d at 531 ("Comments by the court which reflect unfavorably on counsel's conduct at trial are not prejudicial unless of a serious nature."); Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 780 (9th Cir.1990) ("Cutting comments to counsel, particularly those relating to skill rather than good faith or integrity, will not generally mandate reversal.").
 
 
 35
 B. Prejudicial conduct of juror Kondo.
 
 
 36
 AY next contends that the conduct of juror Kondo, and the district court's inadequate response to it, fatally prejudiced AY's case. Juror Kondo passed two notes to the judge, one on day seven of the trial and one on day nine. In the first note, she complained about the volume of testimony and about losing money by being forced to sit on the jury. The judge called a sidebar, at which he proposed a response to the note to which the attorneys agreed. Defense counsel raised the possibility of excusing the juror, but made no motion to do so and soon agreed with the judge's proposed reply. We find no judicial misconduct here.
 
 
 37
 Juror Kondo's second note, in which she stated that "[e]ven if counsel for defense were fortunate enough to have drawn a jury of brain-damaged individuals, they still would have no case," left no doubt that she needed to be excused. The judge again discussed the problem with counsel and recommended waiting until the end of the day to excuse her "so there [wouldn't] be any upset." AY requested that she be removed immediately, moved for a mistrial, and asked the judge to voir dire the jury to see if Kondo had affected their impartiality. The judge refused, not wanting "to indicate to the jurors that there is any problem." After the jury returned its verdict, the judge asked the jury whether "during your discussions in the jury room, anything that Ms. Kondo said or did during the trial affected you in your deliberations as to your individual assessments of the evidence in the case." All jurors answered no.
 
 
 38
 The record thus indicates that the district judge handled the problem in a fair and even-handed manner. There is no evidence of judicial bias.
 
 
 39
 C. Questioning of AY's witnesses.
 
 
 40
 Finally, AY points to the district court's questioning of several of its witnesses as evidence of unacceptable judicial bias. AY notes four particular instances where the district judge posed more than one or two follow-up questions: (1) the examination of AY's expert accounting witness, Holder, about the definition of the term "acquire;" (2) the questioning of one of AY's auditors about the appropriateness of listing, as inventory of the FPI partnerships, plants for which FPI had paid Agretech but which Agretech had not acquired and thus did not exist; (3) the questioning of another of AY's auditors about whether AY had correctly calculated net realizable value in its audit of the 1985-I partnership; and (4) the examination of a former FPI employee about a $500,000 invoice paid to FPI by Agretech for "consulting services" that in fact had never been rendered.
 
 
 41
 These questions do not constitute sufficient grounds for reversal. First, the judge instructed the jury at the beginning of the trial that they were "not to consider my questioning of a witness, even if it may become lengthy, as an indication of what I feel about the case in general, or the testimony of that witness in particular." Such an instruction can help "alleviate[ ] any appearance of impartiality the judge's questioning may have conveyed." Kennedy, 901 F.2d at 710.
 
 
 42
 Second, a district judge has the undeniable right to examine witnesses and call the jury's attention to important evidence. Id. at 709. In Kennedy, we held that even though the district judge's "questioning was not marked by complete indifference [and instead sometimes was] quite pointed and intemperate," reversal was not required. Id. We noted that the trial judge's questioning filled only eight pages of a 400-page trial transcript and that the "court [did not] dominate questioning of the witnesses so as to preempt counsel's function." Id. Similarly, the district judge's questioning here filled only 12 pages of a 3,000-page transcript and came nowhere close to preempting counsel. "Reversal [is not] required where the judge emphasizes evidence; nor where the judge expresses skepticism, provided that the witness has an opportunity to respond." Kern, 899 F.2d at 780. Such was the case here.[2]
 
 III. Evidentiary Rulings
 
 43
 A. Bifurcation.
 
 
 44
 California law requires a trial court to bifurcate the liability and punitive damages phases of trial. The jury is first asked to return a verdict on the underlying claim and then, if the verdict favors the plaintiff, to determine whether the defendant acted with "malice, oppression, or fraud" in accordance with Cal.Civ.Code Sec. 3294. Cal.Civ.Code Sec. 3295(d) (West Supp.1993). If the jury answers both questions in the affirmative, then plaintiffs are permitted in a subsequent proceeding to introduce evidence of defendant's financial condition, before the jury determines whether an award of punitive damages should be made. Id.
 
 
 45
 The district court had earlier determined that California law was applicable. AY argues that the California bifurcation statute should therefore have been applied and evidence of AY's financial condition not submitted to the jury until it had made the requisite determinations. However, the district court determined that since bifurcation was a procedural issue and this was a diversity jurisdiction case, federal law controlled. The district court therefore exercised its discretion under Fed.R.Civ.P. 42(b) to permit the jury to hear evidence of AY's net worth and income before the start of its deliberations.
 
 
 46
 In diversity cases, federal procedural rules apply where they "cover[ ] the point in dispute," Hanna v. Plumer, 380 U.S. 460, 470 (1965), at least where no conflicting state rule "would substantially affect ... primary decisions respecting human conduct." Id. at 475 (Harlan, J., concurring). As the Second Circuit has noted, "[a] rule governing bifurcation is a clear example of a rule of adjudication, with virtually no impact upon primary conduct." Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 283 (2d Cir.), cert. dismissed, 497 U.S. 1057 (1990); see also Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 14-15 (2d Cir.1988) (permissible not to bifurcate liability and punitive damage issues despite state law requiring bifurcation), cert. denied, 490 U.S. 1006 (1989); cf. Sellers v. Baisier, 792 F.2d 690, 694 (7th Cir.1986) ("Rule 42 may be applied in diversity cases [to bifurcate the issues of liability and damage] even though the state law employed to determine the substantive issues in the case prohibits bifurcated trials."). We therefore find that the district court did not err in selecting Rule 42(b) as the applicable rule, rather than Cal.Civ.Code Sec. 3295(d).
 
 
 47
 The only remaining issue is whether the district court's decision not to bifurcate the trial was an abuse of discretion. See Counts v. Burlington N. R.R. Co., 952 F.2d 1136, 1139 (9th Cir.1991). Because AY never made a detailed offer of proof regarding the need for bifurcation, we hold that the district court did not abuse its discretion in refusing to bifurcate the trial.
 
 
 48
 B. Plaintiffs' experts' "horticultural" opinions.
 
 
 49
 AY contends that the district court erroneously admitted opinions on horticultural matters from plaintiffs' experts. Because AY objected to their admission, we review for abuse of discretion and will not reverse absent some prejudice. See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 601 (9th Cir.1991).
 
 
 50
 Clifford Kupperberg, plaintiffs' audit expert, testified that AY failed to obtain sufficient documentation to support the key assumption that Agretech had the ability and capacity to provide the necessary plant materials for the 1985-I partnership and to cultivate those plant materials to maturity. To show the inaccuracy of AY's estimates of the bench space required to grow the plants, he presented some of his own calculations, based on information provided by Robert DeNeve (plaintiffs' horticultural expert). Contrary to AY's claim that he "did not attempt to tie his horticultural calculations to his testimony about AY's audit negligence," Kupperburg did in fact present these calculations as the type of analysis that a reasonably competent and diligent accountant should perform. The testimony was thus within his area of expertise, and the district court did not abuse its discretion by allowing him to present it.
 
 
 51
 Similarly, Thomas Hayes, the Agretech bankruptcy trustee, testified that in his opinion the funds provided to Agretech for cultivating plants were far less than the sums required to grow them to marketable size, and that Agretech had fewer plants than it had committed to grow and too little bench space on which to grow them. Again, all expert knowledge he required to perform his calculations was provided by the acknowledged horticultural expert DeNeve (as well as Agretech's own crop growing schedule and other nurserymen). The calculations themselves simply compared required inputs to actual inputs and were not complicated; they fell within Hayes' area of expertise as a businessman and bankruptcy trustee. The district court did not abuse its discretion by admitting the testimony.
 
 
 52
 Finally, AY challenges the district court's admission of DeNeve's opinions about the feasibility of Agretech's marketing plans. AY claims that DeNeve is an expert in matters of propagation of tropical plants but not in their marketing. However, DeNeve testified that he had 25 years in the tropical foliage industry and was experienced in the marketing of foliage. Thus, the district court did not abuse its discretion in admitting the testimony.
 
 
 53
 C. AY's horticultural evidence.
 
 
 54
 First, AY claims that the district court abused its discretion by excluding the testimony of Kirk Clark, an experienced nurseryman who would have testified that the marketing plans of the 1985-I partnerships were reasonable. The district court determined that Clark's experience and training was not in the area of the tropical plants grown by Agretech, and that therefore he could not testify as an expert on such plants. On the basis of this determination, the district court did not abuse its discretion in excluding his testimony.
 
 
 55
 Second, AY claims that the district court abused its discretion by excluding the deposition testimony and written report of Ian Baldwin, a nursery consultant for Agretech. According to AY, this evidence would have countered DeNeve's observations about the overcrowding of Agretech's plant-growing facilities. However, DeNeve's testimony was specific and expert; he noted that "[t]he plant material was too close together" and "[t]he plants were overgrown for the pots in which they were planted." In contrast, Baldwin's testimony represented the general observations of a percipient witness; for example, he noted that Agretech was a "large company ... doing a better quality and production job than I had seen in much, much smaller facilities." Because this testimony was so general, it would not have directly contradicted DeNeve's, and therefore the district court did not abuse its discretion by excluding it as irrelevant.
 
 
 56
 Finally, AY challenges the district court's refusal to let Richard Garcia, the owner and president of Agretech, testify as to certain bench space and expense calculations made by trial counsel Michael Rugen with information provided by Garcia. Because Garcia did not actually perform the calculations himself, Rugen would have had to testify to lay a foundation as to how they were prepared. However, the advocate-witness rule--which prohibits an attorney from appearing as both a witness and an advocate in the same litigation--prevented him from doing so. See United States v. Prantil, 764 F.2d 548, 552-53 (9th Cir.1985). Therefore, the district court did not abuse its discretion in refusing to allow the calculations into evidence.
 
 IV. Section 10(b) Claims
 
 57
 The district court instructed the jury on several theories of Sec. 10(b) liability. Among them was a theory of secondary liability, whereby AY could be liable for its conduct in aiding and abetting other actors' violation of Sec. 10(b). The United States Supreme Court recently held that private plaintiffs may not maintain suits for aiding and abetting liability under Sec. 10(b). Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 114 S.Ct. 1439, 1448 (1994).
 
 
 58
 The jury rendered a general Sec. 10(b) verdict, so we cannot know on which theory the jury found AY liable. The general rule is that such a verdict cannot stand. See Maryland v. Baldwin, 112 U.S. 490, 494 (1884); see also Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 29-30 (1962); Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 1001 (9th Cir.1986), cert. denied, 479 U.S. 1031 (1987). Although there is authority suggesting that we have discretion to uphold the verdict in certain circumstances, see Kern v. Levolor Lorentzen, Inc., 899 F.2d at 777, we decline to exercise any such discretion here, especially because AY's principal defense was that it was the unwitting dupe of FPI's principals. While the jury clearly disbelieved this defense, given its findings of scienter with respect to the common-law claims in the case, it is nonetheless possible that the jury might not have found primary Sec. 10(b) liability. See also Counts v. Burlington N. R.R., 952 F.2d at 1140 (declining to exercise discretion in part because "of the four theories that were submitted to the jury, only one was submitted to the jury free from error."). We therefore reverse the Sec. 10(b) verdict.
 
 V. Section 11 Claim
 
 59
 A. Due diligence instructions.
 
 
 60
 A Sec. 11 expert defendant can avoid liability by proving that, after reasonable investigation, he had reasonable ground to believe and did believe that the expertised portions of the registration statement contained no material misstatements or omissions. 15 U.S.C. Sec. 77k(b)(3)(B)(i) (1988). The district court concluded its instructions on this "due diligence" defense with the following statement:
 
 
 61
 What constitutes a reasonable investigation and reasonable ground to believe will vary depending on all the factual circumstances. To prove that they did a reasonable investigation and had reasonable ground for their beliefs, Arthur Young and Karl Haushalter must prove that they acted as a prudent man would have acted in the management of his own property. To demonstrate that they did a reasonable investigation, Arthur Young and Karl Haushalter must demonstrate at least that they undertook to verify the registration statement by examining the available original documents. Mere inquiry of others, without more, is insufficient.
 
 
 62
 (Emphasis added). AY contends that the highlighted language rendered the instructions erroneous. We consider jury instructions as a whole to determine if they are misleading or inadequate. Oviatt v. Pearce, 954 F.2d 1470, 1481 (9th Cir.1992).
 
 
 63
 AY contends first that the statement required AY to "verify" the offering documents, rather than conduct a "reasonable investigation." This contention is meritless. The statement simply defined "reasonable investigation" as undertaking to verify the registration statement; the instruction did not require AY to do more than a "reasonable investigation."
 
 
 64
 AY also contends that the statement expanded its duty of investigation to cover the entire registration statement, rather than only the expertised portions. While the highlighted section does refer generally to the "registration statement," in the three pages of instructions on the due diligence defense prior to this section the district court stated five times that AY could be held liable only for the expertised portion of the registration statement. The instructions taken as a whole were not misleading or inadequate.
 
 
 65
 B. The loss causation verdict.
 
 
 66
 Under Sec. 11, defendants are liable only for the losses caused by material misrepresentations or omissions in the registration statement. Once the plaintiff has established damages, the defendant may prove that all or part of those damages were caused by factors other than those misrepresentations or omissions.[3] Thus, while in the Sec. 10(b) context it is the plaintiff who must prove loss causation, in the Sec. 11 context it is the defendant who has the burden of proving that his misdeeds were not the cause of the losses.
 
 
 67
 At trial, AY requested that the court submit to the jury an interrogatory asking them to make a specific finding regarding loss causation. Although the jury's general verdict found for the plaintiffs,[4] the jury announced in its response to the interrogatory that 90 percent of the loss was caused by factors other than misrepresentations or omissions contained in the 1985-I prospectus.[5]
 
 
 68
 Plaintiffs' attorney immediately requested a sidebar to seek clarification of this finding, on the ground that the jury might have misunderstood the instruction. The court decided to inquire "as to that one question," and asked the jury whether it was allocating 90 percent of the fault to other factors or whether it was "placing fault at that figure upon [AY]?" The court then asked the jury to
 
 
 69
 go back to the jury room with that verdict, and to consider it. You will have to consider it further. You come right back out, with the number. It is not to deliberate further on that aspect of it.
 
 
 70
 The jury returned with the following answer to the interrogatory: "90 percent at fault, Arthur Young." (Emphasis added).
 
 
 71
 It is unclear from the record why the district court felt that the interrogatory needed to be resubmitted to the jury. The judge made the following statement prior to resubmission:
 
 
 72
 Was [the original 90 percent] valuation based on your determination that there were other factors other than what [AY] did or did not do with reference to the [1985-I] prospectus, or was it that you were placing fault at that figure upon [AY]? [ ...]
 
 
 73
 The jury has some understanding about what they were being asked in that question. As to whether that was the percentage of fault that you would attribute to the conduct of [AY], because you found for the plaintiffs, or whether it was a fact that other persons may have made misrepresentations and you felt that [AY] was only responsible for 10 percent of the loss, I'm not going to answer that.
 
 
 74
 The judge apparently felt that the jury might have misunderstood the interrogatory, that they might have felt that it was asking for the percentage of losses attributable to AY's conduct when in fact it was asking for the percentage of losses not attributable to AY's conduct. In addition, the plaintiffs and the district court both apparently felt that the jury's original 90 percent finding was contrary to the weight of the evidence. Plaintiffs' attorney Heimann stated at the time that "[t]here is absolutely no evidence at all that any of the losses are not attributable to misrepresentations or omissions," and the district court later awarded plaintiffs attorneys' fees on the ground that AY's defense was frivolous, stating that "the jury found that 10%, if it has any validity, and there had been a motion for judgment not withstanding [sic] the verdict on that issue alone, I would have granted it."
 
 
 75
 AY contends that the district court's resubmission of the verdict violated the Seventh Amendment. The Seventh Amendment requires a court to adopt a jury's verdict if the answers to the interrogatories in the verdict are consistent. Nance v. Gulf Oil Corp., 817 F.2d 1176, 1178 (5th Cir.1987). Furthermore, "it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them." Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963). If the answers cannot possibly be harmonized, then Fed.R.Civ.P. 49(b) authorizes the trial court to return to the jury for further consideration answers to interrogatories that are inconsistent with each other or with the general verdict.[6]
 
 
 76
 However, the jury's initial answer to the interrogatory was clear on its face and not "inconsistent" with the general verdict or the other special verdict.[7] "Answers to special interrogatories do not present a square conflict with the general verdict where such answers do not exhaust all of the possible grounds on which the finding implicit in the general verdict may have been based." United Air Lines, Inc. v. Wiener, 335 F.2d 379, 407 (9th Cir.), cert. dismissed, 379 U.S. 951 (1964) (citing Arnold v. Panhandle & Santa Fe Ry. Co., 353 U.S. 360, 361 (1957)). Here, a jury could find that a Sec. 11 expert defendant was liable under Sec. 11(a)(4) for the material misstatements and omissions "which purport[ ] to have been prepared or certified by him," but also consistently find, pursuant to Sec. 11(e), that not all of the plaintiffs' damages resulted from those misstatements and omissions. In other words, a defendant can be culpable without his misdeeds being responsible for all the losses.
 
 
 77
 Thus, the jury's finding that 90 percent of plaintiffs' losses were due to factors other than the misstatements and omissions for which AY was responsible was not inconsistent with the general Sec. 11 verdict in favor of plaintiffs. Consequently, Rule 49(b) did not authorize the district court to resubmit the special interrogatory to the jury. The district court erred by not entering the "appropriate judgment" pursuant to Rule 58: that AY's misdeeds caused 10% of plaintiffs' losses.
 
 
 78
 However, had the district court done so, the plaintiffs would almost certainly have made a Fed.R.Civ.P. 50(b) motion for judgment notwithstanding the verdict,[8] because they did so even after the jury returned its second answer finding AY responsible for 90% of plaintiffs' losses. The district court denied the motion, and plaintiffs appeal this denial. We review the denial of a Rule 50(b) motion de novo, and reverse only if "it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." Erickson v. Pierce County, 960 F.2d 801, 804 (9th Cir.), cert. denied, 113 S.Ct. 815 (1992).
 
 
 79
 We find no evidence in the record to support the jury's finding that AY had proved that even 10 percent of the plaintiffs' losses were due to factors other than misrepresentations and omissions in the 1985-I prospectus.[9] AY argues that the non-expertised text failed to inform prospective investors about the Ponzi scheme to divert newly invested funds to earlier partnerships, and that the jury could have found that this omission caused far more loss than any inaccuracies in the audited financial statements. However, the interrogatory did not distinguish between the expertised and non-expertised portions of the prospectus; it simply asked the jury to determine the portion of the losses that AY had proved were caused by factors other than misrepresentations or omissions "contained in the Nursery Partners 1985-I prospectus." (Emphasis added). The evidence shows that there were no factors other than those concealed by the fraudulent offering documents that caused any of plaintiffs' losses.[10] Thus, the jury's finding that 10 percent of the plaintiffs' losses had independent causes was clearly inconsistent with the evidence in any event.[11]
 
 
 80
 We thus hold that the district court erred by not granting plaintiffs' Rule 50(b) motion for judgment notwithstanding the verdict. For this same reason, we hold that the district court's error in resubmitting the loss causation interrogatory to the jury was irrelevant and not determinative of the ultimate outcome on the Sec. 11 claim. Regardless of whether the jury's answer was 10 percent or 90 percent, the district court should have granted plaintiffs' Rule 50(b) motion, and entered judgment against AY for 100 percent of the 1985-I plaintiffs' losses. We direct the district court to enter the appropriate judgment on remand.[12]
 
 
 81
 C. Damages.
 
 
 82
 AY claims that the tax benefits received by the plaintiffs (from 63 to 83 percent of the amounts they invested) should be deducted from the damage awards. AY attempted to introduce evidence of these benefits at trial, but the district court denied them permission to do so. AY contends that this denial was erroneous and that the plaintiffs' damages should be reduced by the amount of their tax benefits. The district court's construction of the Federal Rules of Evidence is a question of law that we review de novo. United States v. Cuozzo, 962 F.2d 945, 947 (9th Cir.), cert. denied, 113 S.Ct. 475 (1992).
 
 
 83
 In Burgess v. Premier Corp., 727 F.2d 826 (9th Cir.1984), we held that tax benefits should not be deducted from a rescissionary award, because "[s]uch a result leaves the government bearing the cost of defendants' fraud." Id. at 838. Setting the damages equal to the plaintiffs' losses exclusive of tax benefits forces the defendants to bear the true costs of their misdeeds, and does not give plaintiffs a double recovery because under the tax benefit rule, their prior tax benefits will be disallowed. Id.
 
 
 84
 Although Burgess addressed the deductibility of tax benefits from a rescissionary award, the Burgess reasoning applies with equal force to the award of out-of-pocket losses received by the plaintiffs here.[13] If we were to deduct the tax benefits from the award, the government would effectively become "the banker for fraudulent tax shelter activity." Id. at 838. The plaintiffs will not receive a double benefit because under the tax benefit rule they will have to file amended returns.[14] Furthermore, if exclusion of tax benefits is appropriate under a rescissionary award--equal to a return of the consideration paid for the investment less any value received on the investment, Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1413 (9th Cir.1987)--then such exclusion is even more appropriate in the present case, where there is no obligation to offset the out-of-pocket loss with any "value received." We hold that the district court did not err in excluding the evidence of plaintiffs' tax benefits.[15]
 
 
 85
 D. Reduction of damages in accordance with settlement.
 
 
 86
 Shortly before trial, plaintiffs concluded an "agreement to agree" with five of the former officers of FPI. This agreement was essentially a settlement, by which plaintiffs would receive $500,000 in disputed insurance proceeds and assignment of all rights to certain other property. The parties deferred the finalization of the agreement until after resolution of plaintiffs' case against AY. The district court granted preliminary approval to the settlement and subsequently severed plaintiffs' claims (and AY's cross-claims) against the five FPI principals for adjudication in a separate trial. After the verdict was returned against AY, plaintiffs finalized their agreement with the five on precisely the same terms agreed upon earlier, and the district court approved the settlement.
 
 
 87
 AY would have been able to argue that this agreement was a settlement entitling AY to a Kaypro instruction, which would have instructed the jury to determine the percentage of culpability attributable to the nonsettling defendants, including AY. Those defendants would then be required to pay only the percentage of the total damages amount for which they were responsible. See Franklin v. Kaypro Corp., 884 F.2d 1222, 1231 (9th Cir.1989), cert. denied, 498 U.S. 890 (1990).
 
 
 88
 After the severance, plaintiffs and AY entered into a stipulation whereby AY relinquished the right to seek a verdict reduction on Kaypro grounds and the plaintiffs agreed to reduce any verdict in their favor by the greater of 27.5 percent of the verdict (excluding punitive damages) or $2,291,150. The district court approved this agreement. Based upon the agreement, AY did not request a Kaypro verdict form.
 
 
 89
 However, at a post-trial hearing, the district court refused sua sponte to reduce the Sec. 11 verdict as contemplated by the agreement. The district court did not clearly state its reasons for not doing so, but it appears that the judge believed that Sec. 11 does not provide for joint and several liability among defendants, and that therefore it was proper to exclude the Kaypro credit.
 
 
 90
 This finding was erroneous. Section 11(f) specifically provides that all persons liable "shall be jointly and severally liable." 15 U.S.C. Sec. 77k(f) (1988). Furthermore, the parties had stipulated to the verdict reduction and the district court had approved their stipulation. Therefore, we reverse the district court's refusal to reduce the Sec. 11 verdict in accordance with the parties' stipulation, and remand for the district court to do so.
 
 
 91
 E. Attorneys' fees award.
 
 
 92
 Under Sec. 11(e), the district court "may, in its discretion," award attorneys' fees if it "believes the suit or the defense to have been without merit." 15 U.S.C. Sec. 77k(e) (1988). "We have stated that fees 'may be awarded under section 11(e) only if the claim or defense borders on the frivolous or is brought in bad faith.' " Stitt v. Williams, 919 F.2d 516, 530 (9th Cir.1990) (quoting Western Fed. Corp. v. Erickson, 739 F.2d 1439, 1444 (9th Cir.1984)). The district court awarded plaintiffs attorneys' fees under Sec. 11(e); AY contests the award. We review the district court's decision for abuse of discretion and will overturn it only if "we have a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached after a weighing of the relevant factors." Id. at 531.
 
 
 93
 AY argues that the district court's fee award was an abuse of discretion for two reasons. First, because the district court denied plaintiffs' Rule 50(a) motion for a directed verdict, it implicitly recognized that the evidence presented by AY was sufficient to create a triable issue of fact on the Sec. 11 claims. According to AY, this decision alone should have precluded the award of attorneys' fees to plaintiffs. See Miller v. Los Angeles County Bd. of Educ., 827 F.2d 617, 620 (9th Cir.1987) ("[a] court should be particularly chary about awarding attorney's fees where the court is unable to conclude that the action may be dismissed without proceeding to trial.").[16]
 
 
 94
 The district court's explanation for its decision to award fees is somewhat murky:
 
 
 95
 In any event, I think that from the presentation that the defense was frivolous. The defendant could have made an offer of judgment pursuant to the rules upon that claim alone, maintaining that their position as to the rest of the litigation didn't do it. And the jury found that 10%, if it has any validity, and there had been a motion for judgment notwithstanding the verdict on that issue alone, I would have granted it.
 
 
 96
 This statement is confusing because the district judge is apparently saying that he would have granted a plaintiff JNOV motion on the loss causation issue, thus implicitly stating that he found AY's defense to be frivolous. However, as noted above, plaintiffs did make a Rule 50(b) motion for judgment notwithstanding the verdict, but the district court denied it--thereby implicitly finding that AY's defense was not frivolous.
 
 
 97
 For meaningful and effective appellate review, it is important that the " 'district court ... provide a concise but clear explanation of its reasons for the fee award.' " D'Emanuele v. Montgomery Ward & Co., 904 F.2d 1379, 1384 (9th Cir.1990) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)). Therefore, we remand to the district court for it to reconsider its award of attorneys' fees and provide a clear and reasoned explanation for its ultimate decision.
 
 VI. State Law Claims
 
 98
 A. Negligence.
 
 
 99
 The California Supreme Court recently held that "an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services." Bily v. Arthur Young & Co., 834 P.2d 745, 767 (Cal.1992). Because AY audited FPI financial statements, it owed a duty of care only to FPI, and not to the investors in the partnerships. Therefore, the class plaintiffs, all of whom were investors, may not recover from AY on a common law negligence theory.
 
 
 100
 B. Negligent misrepresentation.
 
 
 101
 We must first decide whether, after Bily, plaintiffs are among the class of persons who may recover damages from AY on a common law negligent misrepresentation claim. The Bily court defined this class by adopting the definition set forth in the Restatement Second of Torts Sec. 552.[17] Id. at 768-73. The court, paraphrasing the Restatement, held that
 
 
 102
 a supplier of information is liable for negligence to a third party only if he or she intends to supply the information for the benefit of one or more third parties in a specific transaction or type of transaction identified to the supplier.
 
 
 103
 834 P.2d at 758. The Restatement states that the supplier of information need not know the actual identities of the intended beneficiaries, but only their general nature, such as creditors, suppliers, or investors.[18] The Restatement also implies that if a client tells his accountant that he intends to use the financial statements to recruit investors, then the accountant is liable to any investor for material misstatements in the audited statements.[19]
 
 
 104
 This was precisely the situation faced by AY. AY audited the offering documents for specific partnerships; it knew that the documents would be used to solicit investors in those partnerships. Therefore, while AY might not have been liable to, say, a bank that relied on the offering documents to extend a loan to FPI, AY is liable to the class plaintiffs, all of whom were investors in the partnerships funded through offering documents audited by AY.
 
 
 105
 We must next decide whether the district court correctly instructed the jury regarding the elements of negligent misrepresentation. AY claims that "the district court erred by instructing the jury that the Affiliated Ute presumption applied to plaintiffs' California claims." Indeed, the California Supreme Court recently held that presumptions of reliance in fraud and negligent misrepresentation actions are improper. See Mirkin v. Wasserman, 858 P.2d 568 (Cal.1993).
 
 
 106
 However, in making this argument AY offers a presumption of its own which we reject; we disagree with AY's assertion that the district court instructed the jury that plaintiffs were entitled to a presumption of reliance on any negligent material omissions. The district court did instruct the jury, with regard to plaintiffs' fraud claim, that "in this case, the law presumes reliance if the fraudulent representation involves the omission to state a material fact." (Emphasis added). As a result, the fraud instructions were erroneous. However, in instructing the jury on the elements of negligent misrepresentation, the district court never gave a presumed reliance instruction. The district court stated only that "plaintiff must prove that ... [he] acted in reliance of [sic] the truth of the representation and he [was] justified in relying on the representation," and made no mention of any presumptions. Later, in a general instruction on when reliance is "justified," the district court reiterated its earlier statement that "the defendants may also rebut the presumption of reliance " (emphasis added); but the district court never connected this statement to the elements of negligent misrepresentation. Thus, we reject AY's claim that the district court instructed the jury that the Affiliated Ute presumption applied to all the plaintiffs' California claims.
 
 
 107
 We affirm the jury's verdict for plaintiffs on their common law negligent misrepresentation claim, and therefore we need not further consider AY's challenge to the common law fraud verdict, on which any award of actual damages would be merely duplicative in any event.
 
 VII. Punitive Damages
 
 108
 The jury found against AY on each of the three state law theories of liability submitted, but rendered a general verdict with respect to related punitive damages. We have determined that plaintiffs' negligence claims were improperly submitted[20] and, although we do not resolve the matter, the error in the jury instructions on plaintiffs' fraud claims means that the fraud verdict might only be upheld through application of harmless error analysis.[21] Under these circumstances, we must reverse the jury's punitive damages verdict and remand for retrial on punitive damages only, because we cannot know whether the jury may have based its punitive damages award on improper considerations. See Robertson Oil Co. v. Phillips Petroleum Co., 871 F.2d 1368, 1376 (8th Cir.1989) (award reversed because "[s]ome or all of the punitive damage award may have rested upon theories improperly submitted to the jury"). Although the jury was properly instructed to make an independent finding of fraud, oppression, or malice, the award nonetheless depended wholly on the underlying tort causes of action. See Hilliard v. A.H. Robins Co., 196 Cal.Rptr. 117, 127-28 (Cal.Ct.App.1983). This situation does not merely implicate the usual rule respecting general verdicts resting on both proper and improper theories of liability, see Part IV supra; in addition, the excessive cumulative weight of its preceding deliberations may have unduly influenced the jury's judgment regarding the proper amount of punitive damages.
 
 VIII. Post-Trial Rulings
 
 109
 A. In gross judgment.
 
 
 110
 It is possible that some of the individual investors in one or more of the plaintiff classes will not make claims against AY, and that therefore there may be excess damages funds after distribution. We have held that in such situations the district court is required to formulate a procedure for distributing unclaimed funds. Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1307 (9th Cir.1990). However, neither the district court's final judgment nor any subsequent order has formulated such a procedure. AY contends that the district court should amend its judgment to include a provision for excess funds to revert to AY.
 
 
 111
 We agree with AY that we must remand to the district court to formulate a procedure for the distribution of unclaimed damages, but we do not agree that the unclaimed amounts must necessarily revert to AY. We have held that a district court's alternatives for such a procedure include: (1) pro rata distribution of the funds to located class members; (2) cy pres or fluid distribution, (3) escheat to the government, and (4) reversion to the defendant. Id. In this particular case, we reject the first alternative because individual plaintiffs' recoveries on the Sec. 10(b), Sec. 11, and common law claims must be limited to their actual damages. See 15 U.S.C. Sec. 78bb(a) (1988) (recovery under Sec. 10(b) limited to "actual damages on account of the act complained of."); 15 U.S.C. Sec. 77k(e) (1988) (recovery under Sec. 11 limited to difference between amount paid for security and value of security at time of suit or price at which security disposed of in market before suit, and in no case shall exceed offering price); Cal.Civ.Code Sec. 3343 (West Supp.1993) (recovery under common law fraud limited to difference between actual value of property parted with and actual value of property received, plus any additional damage arising from the particular transaction). Distributing the unclaimed funds pro rata would thus give the claiming class members a windfall; it might also encourage the bringing of class actions likely to result in large uncollected damage pools and create conflicts of interest between named plaintiffs and other class members. See Van Gemert v. Boeing Co., 553 F.2d 812, 815-16 (2d Cir.1977).[22] Thus, any excess unclaimed damages should not be distributed among the claiming plaintiffs.
 
 
 112
 However, the district court may select whichever of the other three alternatives it feels is most appropriate, consistent with the law of this Circuit. See Six Mexican Workers, 904 F.2d at 1307-08 (cy pres distribution appropriate for the limited purpose of distributing unclaimed funds; escheat to the government appropriate when such procedure serves the deterrence and enforcement goals of the substantive federal statute; reversion to the defendant appropriate when deterrence is not a goal of the statute or is not required by the circumstances).
 
 
 113
 B. Prejudgment interest rate.
 
 
 114
 The district court awarded plaintiffs prejudgment interest at the rate of "prime plus 1% and compounded" without providing any justification for the award. We have held that the appropriate rate of prejudgment interest for civil money judgments in federal court is the rate paid on 52-week U.S. Treasury bills immediately prior to the date of judgment, as per 28 U.S.C. Sec. 1961(a) (1988). Blanton v. Anzalone, 760 F.2d 989, 993 (9th Cir.1985). The district court may depart from the Treasury bill rate, but only if substantial evidence supports the decision to do so and only if the departure is accompanied by a reasoned justification. Blanton v. Anzalone, 813 F.2d 1574, 1576 (9th Cir.1987). Thus, the district court abused its discretion by not providing an explanation for its departure, and we vacate the district court's award of prejudgment interest and remand with instruction to either apply the rate set forth in 28 U.S.C. Sec. 1961 or provide a reasoned explanation of the substantial evidence supporting a departure from that rate. The district court may award simple or compound interest at its discretion. See Gorenstein Enters. v. Quality Care-USA, Inc., 874 F.2d 431, 437 (7th Cir.1989) (affirming district court's award of compound interest and citing cases from other circuits leaving the matter to the discretion of the district court).
 
 BANKRUPTCY TRUSTEES' APPEAL
 
 115
 The trustees' complaints allege claims against AY for (1) negligence, (2) aiding and abetting breaches of fiduciary duty, (3) civil conspiracy, and (4) unfair and deceptive business practices under Haw.Rev.Stat. Sec. 480-2. AY moved to dismiss both complaints pursuant to Fed.R.Civ.P. 12(b)(6), and the district court granted the motions without explanation and without leave to amend.
 
 
 116
 We review de novo a district court's Rule 12(b)(6) dismissal for failure to state a claim. Oscar v. University Students Co-op. Ass'n, 965 F.2d 783, 785 (9th Cir.) (en banc), cert. denied, 113 S.Ct. 655 (1992). We limit our review to the contents of the complaint, and take all allegations of material fact to be true and construe them in the light most favorable to the plaintiff. Love v. United States, 915 F.2d 1242, 1245 (9th Cir.1989). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (quotation omitted).
 
 
 117
 As a preliminary matter, we must decide which state's laws apply to the trustees' complaints. Hayes, the Agretech trustee, is a Hawaii citizen, and Agretech was a Hawaii corporation doing business in Hawaii. Guttman, the FPI trustee, is a Hawaii citizen, and FPI was a Nevada corporation doing business in Hawaii. AY was a New York accounting partnership doing business in Hawaii. The activities and transactions at issue occurred primarily in Hawaii. Therefore, we should apply Hawaii law to the trustees' claims.[23] See Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981).
 
 I. Negligence
 
 118
 The trustees' complaints allege that by early 1985 AY had assumed duties of care toward FPI and Agretech by entering into accountant-client relationships with them. The complaints further allege that AY breached these duties by, inter alia, participating in or failing to detect the Ponzi scheme, miscounting the Agretech plant inventory, and approving the unreasonable projections in the 1985-I prospectus. The district court's order dismissing the complaints did not explain the reasons for doing so. AY argues that dismissal of the Agretech trustee's complaint was proper because AY owed no duty to Agretech, and dismissal of the FPI trustee's complaint was proper because FPI's top management knew about the fraud and their knowledge must be imputed to the corporation.
 
 
 119
 A. AY's duty to Agretech.
 
 
 120
 The Agretech complaint alleges generally that AY performed accounting services for FPI and Agretech and thereby entered into an accountant-client relationship with both companies. Regarding the work that AY performed specifically for Agretech, the complaint alleges that
 
 
 121
 In or before May 1985, ARTHUR YOUNG was retained by Agretech to perform a variety of accounting and management consulting services for Agretech and its affiliated companies, and an accountant-client relationship was formed. ARTHUR YOUNG agreed to, inter alia, review the Agretech accounting systems ... and in that connection, to evaluate conducting a certified audit for Agretech for December 31, 1985; to review the operations of Agretech Distribution, Agretech's marketing arm, and to prepare for future audits ...
 
 
 122
 These allegations, which we must take as true when reviewing a Rule 12(b)(6) dismissal, are sufficient to establish that AY supplied Agretech with management consulting and accounting services, even though they fell short of a formal audit.
 
 
 123
 Hawaii imposes on professionals a duty to exercise due care in the provision of their services. See, e.g., Collins v. Greenstein, 595 P.2d 275, 283 (Haw.1979) (attorneys); Quality Furniture, Inc. v. Hay, 595 P.2d 1066, 1068 (Haw.1979) (insurance agents); Property House, Inc. v. Kelley, 715 P.2d 805, 810 (Haw.1986) (real estate brokers). Because the Agretech trustee's complaint alleges that Agretech retained AY to give advice on accounting and management matters, the complaint alleges sufficient facts to show that by agreeing to render such advice AY assumed a duty of due care. The Agretech trustee's complaint should not have been dismissed on this ground.
 
 
 124
 B. Imputed knowledge.
 
 
 125
 To recover from AY on a negligence claim, the trustees must allege that FPI and Agretech justifiably relied on AY's information and advice.[24] Cf. Quality Furniture, 595 P.2d at 1069 (discussing justifiable reliance as appropriate limitation on insurance agent's liability for negligence). AY claims that the trustees are estopped from establishing reliance because the primary perpetrators of the fraud were the top officers of Agretech and FPI, and therefore knowledge of the fraud should be attributed to both corporations.[25]
 
 
 126
 In situations where officers act for their own benefit, however, Hawaii law explicitly rejects this argument: "[W]hen the officer whose knowledge is sought to be charged to the corporation aids or abets or participates in a fraud for the benefit of himself or of another, his knowledge is not imputable to the corporation." Henry Waterhouse Trust Co. v. Home Ins. Co., 27 Haw. 572, 578 (Haw.1923) (rejecting fidelity bonding company's attempt to defeat claim by receiver on the ground that defrauding officers' knowledge could be imputed to corporation and thus that period for timely notification began running from perpetration of fraud, rather than from its discovery by others); see Employees' Ret. Sys. v. Real Estate Finance Corp., 793 P.2d 170, 174 (Haw.1990) (same regarding claim by judgment creditor).
 
 
 127
 The trustees' complaints allege that the officers of Agretech and FPI used the Ponzi scheme to benefit themselves, and not the corporations, by mismanaging the companies and squandering corporate funds on excessive salaries and perks. The complaints further allege that the officers drove the companies into insolvency by keeping them going after their failure became apparent. at 52(h) ]. Such allegations in the pleadings sufficiently suggest that the officers acted in their own interests and adversely to those of the corporations; the district court thus erred in granting AY's Rule 12(b)(6) motion as to this claim. See Diamond Mortgage Corp. v. Sugar, 913 F.2d 1233, 1248 n. 14 (7th Cir.1990) (holding that the issue of whether the fraud benefited the corporation could not be decided on the pleadings because the facts were insufficiently developed), cert. denied, 111 S.Ct. 968 (1991).[26]
 
 
 128
 II. Civil conspiracy; aiding and abetting breaches of fiduciary duty
 
 
 129
 The trustees' complaints allege that AY conspired with the FPI and Agretech principals to commit the fraudulent acts comprising the Ponzi scheme. The complaints allege in the alternative that AY aided and abetted these acts. Both causes of action were dismissed without explanation. To the extent the district court based its dismissal on the absence of secondary tort liability in Hawaii, however, it erred.
 
 
 130
 The Restatement (Second) of Torts establishes liability both for conspiring to commit a tort and for aiding and abetting the commission of a tort.[27] The Hawaii courts appear to recognize the existence of liability for conspiracy to commit a tort. See Doleman v. Meiji Mutual Life Ins. Co., 727 F.2d 1480, 1482 n. 3 (9th Cir.1984); Chedester v. Stecker, 643 P.2d 532, 536 (Haw.1982). To assert a conspiracy, the complaints must allege that the FPI and Agretech officers owed a duty to the corporations and that they breached this duty. Doleman, 727 F.2d at 1482 n. 3. Both complaints do so. Therefore, the civil conspiracy allegations properly state a claim and should not have been dismissed.
 
 
 131
 Furthermore, although the Hawaii courts have not addressed whether one may be held liable for aiding and abetting the tortious conduct of another, both the Restatement (as noted above) and the California courts have recognized such liability. Pasadena Unified Sch. Dist. v. Pasadena Fed'n of Teachers, 140 Cal.Rptr. 41, 49 (Cal.App.1977). Hawaii courts will look to both of these sources where Hawaii precedent is lacking. See, e.g., Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1424 (9th Cir.1986) (Hawaii's reliance on Restatement); Locricchio v. Legal Services Corp., 833 F.2d 1352, 1357 (9th Cir.1987) (Hawaii's reliance on California law). Therefore, we conclude that the Hawaii Supreme Court would recognize aiding and abetting liability if faced with the issue, and that the district court should not have dismissed this cause of action.
 
 III. Unfair and deceptive business practices
 
 132
 The trustees' complaints allege that AY's actions constituted unfair and deceptive business practices under Haw.Rev.Stat. Sec. 480-2. This statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw.Rev.Stat. Sec. 480-2(a) (1991 Supp.). We have previously concluded that "the Hawaii Supreme Court, if confronted with the question whether [this statute] applies to claims arising from securities transactions, would hold that it does not." Spinner Corp. v. Princeville Dev. Corp., 849 F.2d 388, 393 (9th Cir.1988). Although the trustees' claims do not arise directly from securities transactions, the reasoning set forth in Spinner precludes them from bringing an action against AY under the statute.
 
 
 133
 In Spinner, we noted first that the statute contains a provision requiring that it be "construed in accordance with judicial interpretations of similar federal antitrust statutes." Haw.Rev.Stat. Sec. 480-3 (1991 Supp.). As we noted in Spinner, the statute is almost identical to Sec. 5(a)(1) of the Federal Trade Commission Act (FTCA), 15 U.S.C. Sec. 45(a)(1). See also Eastern Star, Inc. v. Union Bldg. Materials Corp., 712 P.2d 1148, 1154 (Haw.App.1985). This section is intended to
 
 
 134
 prevent such acts or practices which injuriously affect the general public as well as those which are unfair to competitors. In other words, [the statute] makes the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor.
 
 
 135
 American Fin. Services Ass'n v. F.T.C., 767 F.2d 957, 966-67 (D.C.Cir.1985) (quoting H.R.Rep. No. 1613, 75th Cong., 1st Sess. 3 (1937)), cert. denied, 475 U.S. 1011 (1986). The FTCA's prohibition on "unfair or deceptive acts or practices in commerce" is thus aimed at protecting consumers from unscrupulous merchants; to the best of our knowledge, the FTCA has never been applied to negligence or fraud suits by a corporation against its former officers, directors, and outside professional advisors.
 
 
 136
 Furthermore, we concluded in Spinner that "the primary intent of the legislature was to protect consumers from unethical business practices resulting in relatively small commercial injuries." Spinner, 849 F.2d at 391 (emphasis added).[28] FPI and Agretech are not "consumers" and are thus not the type of plaintiffs envisioned by the legislature.
 
 
 137
 For both of these reasons, we conclude here that the Hawaii Supreme Court, if confronted with the question whether the Hawaii statute applies to claims by corporations (or their bankruptcy trustees) against their former officers or professional advisors, would hold that it does not. We therefore affirm the district court's dismissal of this cause of action.
 
 CONCLUSION
 
 138
 We affirm the jury verdicts in favor of the 1985-I plaintiffs on their Sec. 11 and negligent misrepresentation claims only. We reverse the Sec. 10(b) and negligence verdicts, and we do not reach AY's challenge to the fraud verdict. We affirm the jury verdict in favor of the private partnership plaintiffs on their negligent misrepresentation claim, and we again reverse the Sec. 10(b) and negligence verdicts and do not reach AY's challenge to the fraud verdict. We reverse the punitive damages award; because any further award of actual damages under federal or state law would be duplicative in any event, we remand for retrial on the issue of punitive damages only. We also reverse four district court rulings: the denial of plaintiffs' Rule 50(b) motion for judgment notwithstanding the verdict on Sec. 11 loss causation, the refusal to apply the settlement agreement to the Sec. 11 damages, the award of attorneys' fees on the Sec. 11 claim, and the calculation of prejudgment interest. We remand for the district court to enter judgment against AY for 100% of plaintiffs' losses on the Sec. 11 claim, reduce the Sec. 11 damages in accordance with the settlement agreements and to provide clear explanations for its decisions to award attorneys' fees and to use a prejudgment interest rate other than that paid on 52-week Treasury bills. We also remand for the formulation of a procedure to dispose of any unclaimed damages.
 
 
 139
 We also hold that the district court erred in dismissing the trustees' complaints against AY, because the negligence, civil conspiracy, and aiding and abetting allegations all stated claims upon which relief can be granted under Hawaii law. We remand this case to the district court for further proceedings consistent with this disposition.
 
 
 140
 AFFIRMED in part, REVERSED in part, and REMANDED.[29]
 
 
 
 *
 Honorable Manuel L. Real, United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Arthur Young has since merged with Ernst & Whinney to become Ernst & Young
 
 
 [2]
 Although the district court did not allow AY's accounting expert a full opportunity to refute the definition of "acquire," the expert was later able to testify about why he believed the presentation of inventory in the financial statement was in accordance with general accounting standards
 
 
 [3]
 Section 11(e) states in relevant part that:
 if the defendant proves that any portion or all of [the] damages represents other than the depreciation in value of [the] security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.
 15 U.S.C. Sec. 77k(e) (1988).
 
 
 [4]
 The jury returned the following general verdict:
 [W]e the members of the jury find as to defendants Arthur Young & Company and Karl Haushalter on Section 11 claims, for plaintiffs on losses on Capital NP 1985-I.
 
 
 [5]
 The interrogatory and response read as follows:
 [W]e find that of the total difference between the amount paid for the partnership interests in Nursery Partners 1985-I limited partnership and the true value of the partnership interest measured on the date the suit was filed, the portion, if any, that [AY has] proved by a preponderance of the evidence was caused by factors other than misrepresentation or admissions [sic] contained in the Nursery Partners 1985-I prospectus is the following percentage: 90 percent.
 
 
 [6]
 Rule 49(b) provides in relevant part that:
 When the general verdict and the [interrogatory] answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.
 
 
 [7]
 In addition to finding generally for the plaintiffs on their Sec. 11 claims, the jury found specifically that the value of one unit of the NP 1985-I partnership as of the date the suit was filed to be zero dollars
 
 
 [8]
 Prior to December 1, 1991, a Rule 50(b) renewal of motion for judgment as a matter of law was termed a motion for judgment notwithstanding the verdict
 
 
 [9]
 The jury's answer of "90% at fault, Arthur Young" indicates that they may have misunderstood the distinction between culpability and loss causation. Because the interrogatory was directed at loss causation, we will interpret the answer as a finding that 90 percent of plaintiffs' losses were caused by misrepresentations and omissions in the 1985-I prospectus
 
 
 [10]
 Section 11 defendants who have successfully proven that all or part of plaintiffs' losses were caused by factors other than the material misrepresentations or omissions have pointed to factors such as general market declines, Feit v. Leasco Data Processing Equip. Corp., 332 F.Supp. 544, 586 (E.D.N.Y.1971), or the independent reasons behind those market declines, such as high interest rates, inflation, war in the Middle East, and Watergate, among others. Collins v. Signetics Corp., 605 F.2d 110, 115 (3d Cir.1979). AY illuminated no such factors
 
 
 [11]
 We would reach the same conclusion even if the interrogatory had specified "in the expertised portions of the [1985-I] prospectus." AY's assertion that the omission of the plan to recirculate later money to earlier investors was not in the expertised portion of the prospectus is meritless, because this portion included "Forecasted Statements of Cash Flow" with a "Cash Disbursements" category that could have, but did not, indicate the recirculation of certain funds to prior investors
 
 
 [12]
 AY also argues that the jury's initial loss-causation finding applied to plaintiffs' common law claims. However, at least as to economic damages, AY was jointly and severally liable on such claims in any event. See 5 B.E. Witkin, Summary of California Law Secs. 48-51 (9th ed. 1988)
 
 
 [13]
 The "general rule" is that a prevailing securities plaintiff may recover his out-of-pocket losses, 15 U.S.C. Sec. 78bb(a), although the trial judge has the discretion to apply a rescissionary measure of damages. Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1413 (9th Cir.1987)
 
 
 [14]
 AY's contention that "fraud damages are not taxable" is incorrect. Section 104(a)(2) of the Internal Revenue Code allows a deduction for damages received "on account of personal injuries." 26 U.S.C. Sec. 104(a)(2) (West Supp.1992). "Personal injuries" can mean both physical and nonphysical injuries, such as malicious prosecution, Threlkeld v. C.I.R., 87 T.C. 1294 (1986), aff'd, 848 F.2d 81 (6th Cir.1988); defamation, Roemer v. C.I.R., 716 F.2d 693 (9th Cir.1983); and age discrimination, Rickel v. C.I.R., 900 F.2d 655 (3d Cir.1990). However, to the best of our knowledge no federal court has ever expanded the definition of "personal injuries" to include securities fraud
 
 
 [15]
 AY argues that California law also mandates an award of out-of-pocket losses, Cal.Civ.Code Sec. 3343 (West 1970), and that state-law damages should thus also be reduced by the plaintiffs' realized tax benefits. AY cites no law to support this proposition, and for good reason; in addition to the pitfalls noted in the text, the argument is economically irrational. Anticipated tax benefits are merely a portion of an investment's total expected yield. They are not simply a return of capital invested. Administration of an economically accurate remedy would be wholly impracticable
 
 
 [16]
 At least one other circuit has reversed an award of attorneys' fees to defendants despite the fact that the district court granted defendants' motion for a directed verdict. Aid Auto Stores, Inc. v. Cannon, 525 F.2d 468, 471-72 (2d Cir.1975). Here, the district court denied plaintiffs' motion for a directed verdict
 
 
 [17]
 This section provides, in relevant part, that
 (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
 Restatement Second of Torts Sec. 552(1), (2) (emphasis added).
 
 
 [18]
 See comment (h) to Restatement Second of Torts Sec. 552 (emphasis added):
 It is sufficient ... that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.
 
 
 [19]
 Compare com. (h), illus. 7 (accountant liable to all potential lenders for material misstatements in audited financial statements, when client informed accountant that he intended to use the statements to negotiate a bank loan) with com. (h), illus. 10 (when client does not tell accountant the intended purpose of the financial statements, accountant not liable for material misstatements to banks). Both of these illustrations are cited with apparent approval in Bily. 834 P.2d at 758
 
 
 [20]
 See Part VI.A supra
 
 
 [21]
 See Part VI.B. supra
 
 
 [22]
 We also adopt the Van Gemert court's holding that the unclaimed funds may not be used to defray the legal expenses of the claiming members of the class, because "what [plaintiffs] may not gain directly, ... they may not gain indirectly." Van Gemert, 553 F.2d at 816
 
 
 [23]
 After the trustees' claims were dismissed, the district court determined that California law applied to the partnership investors' class action suit. However, that determination was based on the fact that the greatest proportion of the class members were California residents, and those investors are not parties to these suits
 
 
 [24]
 We accept this assertion by AY even though, technically, justifiable reliance is an explicit requirement only for a claim of negligent misrepresentation. See Restatement (Second) of Torts Sec. 552(2)(b) (1977); Chun v. Park, 462 P.2d 905, 908-09 (Haw.1969) ("We believe Sec. 552 of Restatement (Second) of Torts ... is a fair and just restatement of the law on the issue of negligent misrepresentation."). The concept is necessarily subsumed under the general negligence rubric of proximate cause, see, e.g., Collins, 595 P.2d at 283-84, as well as contributory negligence
 
 
 [25]
 The United States Supreme Court's recent decision in F.D.I.C. v. O'Melveny & Myers, 114 S.Ct. 2048, 62 U.S.L.W. 4487, 4488 (U.S. June 13, 1994), makes clear that state law controls the validity of this estoppel argument
 
 
 [26]
 Because we hereby hold that the corporations themselves could have stated a claim on which relief can be granted, we need not resolve the question of whether Hawaii would prevent AY from asserting an otherwise valid imputed knowledge defense against the trustees as receivers. See O'Melveny, 62 U.S.L.W. at 4489
 Moreover, the trustees' complaints allege that AY was at least negligent and possibly worse; the jury's verdict in the class action suit supports their allegations. If proven, such allegations would bar AY from raising its estoppel defense. See, e.g., Hawaiian Ocean View Estates v. Yates, 564 P.2d 436, 442 (Haw.1977). This fact reinforces our conclusion that the complaints cannot be dismissed on estoppel grounds.
 
 
 [27]
 The Restatement provides in relevant part that
 For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
 (a) does a tortious act in concert with the other or pursuant to a common design with him, or
 (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself ...
 Restatement (Second) of Torts Sec. 876 (1977).
 
 
 [28]
 This conclusion was reinforced by the 1987 amendment to the statute, which limited the class of potential plaintiffs to "consumers" and certain state officials. Haw.Rev.Stat. Sec. 480-2(d) (1991 Supp.). However, "neither the language of the statute itself nor the legislative history regarding the amendment give any expressed indication that this statute should be applied retroactively." Dash v. Wayne, 700 F.Supp. 1056, 1059 (D.Haw.1988). See also Bulgo v. Munoz, 853 F.2d 710, 714 n. 2 (9th Cir.1988) ("there is no indication that the legislature intended the 1987 amendment to apply retroactively to a 1982 transaction."). Therefore, the amendment does not preclude suits between businessmen for causes of action which arose prior to the effective date of the amendment. GWC Restaurants, Inc. v. Hawaiian Flour Mills, Inc., 691 F.Supp. 247, 249 (D.Haw.1988). The trustees' suit falls into this category, and is therefore not automatically precluded by the amendment
 
 
 [29]
 Because we do not remand for retrial on any substantive issue, we do not reach the merits of plaintiffs' cross-appeal of the district court's grant of AY's motion for summary judgment on plaintiffs' civil conspiracy and civil RICO claims